J-A03006-15

2015 PA Super 100

| | |
|---|---|
| BETTY L. ROURKE, GUARDIAN OF THE ESTATE AND PERSON OF FREDERICK RICKARD, III, AN INCAPACITATED PERSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE CO., A/K/A PENN NATIONAL | |
| Appellee | No. 1028 MDA 2014 |

Appeal from the Order Entered May 21, 2014
In the Court of Common Pleas of Franklin County
Civil Division at No(s): 2010-3694

BEFORE:  MUNDY, J., STABILE, J., and FITZGERALD, J.[*]

OPINION BY MUNDY, J.:                    **FILED APRIL 28, 2015**

Appellant, Betty L. Rourke, appeals from the March 21, 2012 order granting in part Appellee, Pennsylvania National Mutual Casualty Insurance Company's (Penn National), motion for judgment on the pleadings, and the May 21, 2014 order granting Penn National's motion for summary judgment.[1]  After careful review, we reverse and remand for further proceedings.

---

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court's May 21, 2014 order granting Penn National's motion for summary judgment rendered the trial court's March 21, 2012 order
*(Footnote Continued Next Page)*

The trial court summarized the relevant factual history of this case as follows.

> This case involves a dispute over insurance coverage. On January 28, 2010, Frederick Rickard, III was severely injured in an auto accident while riding as a passenger in a vehicle driven by his friend Chad Odonel. Frederick, who was 19 years old at the time, had been a foster child of James C. Rourke and Betty L. Rourke. The Rourkes were insured by [Penn National]. Mr. and Ms. Rourke were named insureds under a [p]ersonal [a]uto [p]olicy. Mr. Rourke reported the accident to Strickler Insurance Company[and spoke to Miranda Lake] on or about February 4, 2010. At that time, Mr. Rourke requested that Frederick be added as an "insured driver" under the policy. Subsequently, the Rourkes made a claim for UIM coverage and [f]irst [p]arty [b]enefits for Frederick. Penn National denied the claim, stating that Frederick was not an "insured" under the Rourke's policy.

Trial Court Opinion, 8/5/14, at 1.

On August 27, 2010, Appellant filed a complaint, seeking a declaratory judgment. Specifically, Appellant's complaint sought coverage under the subject policy because Frederick was a "family member" under the terms of the policy. Appellant's Complaint, 8/27/10, at ¶¶ 51-67. Appellant also sought coverage on the theories that Frederick was an insured party on the policy and that Appellant had a reasonable expectation of coverage for

*(Footnote Continued)* ———————

appealable. *See Snizavich v. Rohm & Haas Co.*, 83 A.3d 191, 194 (Pa. Super. 2013) (stating, "an appeal of a final order subsumes challenges to previous interlocutory decisions[]") (internal quotation marks and citation omitted), *appeal denied*, 96 A.3d 1029 (Pa. 2014).

Frederick. *Id.* at ¶¶ 67-81. On April 4, 2011, Penn National filed its answer, along with a counterclaim for declaratory judgment. Penn National filed a motion for judgment on the pleadings on September 2, 2011. Appellant filed her response on September 15, 2011, along with a cross-motion for judgment on the pleadings. On September 27, 2011, Penn National filed its response to Appellant's cross-motion. The trial court heard argument on the motions on January 10, 2012. On March 21, 2012, the trial court entered an order and opinion granting Penn National's motion in part, denying it in part, and denying Appellant's cross-motion. The trial court concluded that Frederick was not a family member, nor was he an insured party on Appellant's policy. However, the trial court denied Penn National's motion regarding Appellant's reasonable expectation of coverage claim.

On January 23, 2013, Penn National filed a motion for summary judgment as to Appellant's reasonable expectation claim. Appellant filed her response on February 18, 2013. According to the trial court, it took no action on the motion "as neither party filed a [p]raecipe to [l]ist for [a]rgument as required by local rule." Trial Court Opinion, 8/5/14, at 2. Penn National filed a second motion for summary judgment on August 29, 2013. Appellant filed a response on September 26, 2013. On May 21, 2014, the trial court entered an order granting Penn National's motion for

summary judgment. On June 18, 2014, Appellant filed a timely notice of appeal.[2]

On appeal, Appellant raises the following issues for our review.

> A. Whether the trial court erred in granting [Penn National]'s motions for judgment on the pleadings and holding that [Frederick] was not a family member under the policy entitling him to first party and UIM benefits[?]
>
> > 1. Whether [Frederick] is entitled to first party and UIM benefits as a "foster child" or "ward" of the Rourkes, where [Penn National] chose not to define these terms in the policy it issued to the Rourkes and where the terms are reasonably susceptible to more than one meaning, rendering the policy language ambiguous and requiring that the policy be construed in favor of coverage?
> >
> > 2. Whether [Frederick] is a "foster child" of the Rourkes entitling him to first party and UIM benefits under the terms of the policy?
> >
> > 3. Whether [Frederick] is a "ward" of the Rourkes, entitling him to first party and UIM benefits under the terms of the policy where [Frederick]'s mother is deceased and he had little interaction with his biological father and he lived with the Rourkes as a family member both before and after his dependency was terminated by Franklin County Children and Youth Service?

---

[2] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925. Relevant to this appeal, we note the trial court's August 5, 2014 Rule 1925(a) opinion directs this Court to its March 21, 2012 opinion granting Penn National's motion for judgment on the pleadings in part. *See* Trial Court Opinion, 8/5/14, at 3.

4.      Whether an individual can be a "foster child" or "ward" without a court order?

5.      Whether a "foster child" or "ward" need not be a minor?

B.      Whether the trail [sic] court erred in granting [Penn National]'s motion for summary judgment and holding that the Rourkes did not have a reasonable expectation that [Frederick] would be covered under the policy for first party and UIM benefits?

1.      Whether the Rourkes' expectation of first party and UIM benefits for [Frederick] is reasonable where the record shows that [Penn National]'s agent offered to add [Frederick] retroactively to the policy as of the date of the collision and where the Rourkes paid a substantial increase in premiums related to the policy change?

Appellant's Brief at 5-6 (some capitalization removed).

We begin by noting our well-settled standard of review for judgment on the pleadings.

Entry of judgment on the pleadings is permitted under Pennsylvania Rule of Civil Procedure 1034, which provides that "after the pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for judgment on the pleadings." Pa.R.C.P. 1034(a). A motion for judgment on the pleadings is similar to a demurrer. It may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law.

Appellate review of an order granting a motion for judgment on the pleadings is plenary. The appellate court will apply the same standard employed by the trial court. A trial court must confine its consideration to the pleadings and relevant documents. The court must accept as true

- 5 -

> all well pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted.
>
> We will affirm the grant of such a motion only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise.

*Sw. Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 185 (Pa. Super. 2013) (citation omitted), *appeal denied*, 96 A.3d 1029 (Pa. 2014). Additionally, we note that interpretation of an insurance policy presents a pure question of law, over which our standard of review is *de novo*. *Peters v. Nat'l Interstate Ins. Co.*, 108 A.3d 38, 42 (Pa. Super. 2014) (citation omitted).

We elect to first address the portion of Appellant's argument concerning Frederick's status as a ward. It is undisputed in this case that the plain text of the subject policy provides coverage for family members. It is also not in dispute that under the explicit terms of the policy, the term "'[f]amily member' means a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child." Appellant's Complaint, 8/27/10, Exhibit B, Form PP 00 01 06 98, at 1. The policy does not define the terms "foster child" or "ward."

> The goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy. *401 Fourth St. Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005);

> ***Lititz Mut. Ins. Co. v. Steely***, 785 A.2d 975, 978
> (Pa. 2001). When the language of an insurance
> policy is plain and unambiguous, a court is bound by
> that language. ***401 Fourth St. Inc.***, 879 A.2d at
> 171. Alternatively, if an insurance policy contains an
> ambiguous term, "the policy is to be construed in
> favor of the insured to further the contract's prime
> purpose of indemnification and against the insurer,
> as the insurer drafts the policy, and controls
> coverage." ***Id.*** Contract language is ambiguous if it
> is reasonably susceptible to more than one
> construction and meaning. ***Lititz Mut. Ins.***, 785
> A.2d at 978. Finally, the language of the policy must
> be construed in its plain and ordinary sense, and the
> policy must be read in its entirety. ***Riccio v. Am.
> Republic Ins. Co.***, 705 A.2d 422, 426 (Pa. 1997).

***Pa. Nat'l Mut. Cas. Ins. Co. v. St. John***, 106 A.3d 1, 14 (Pa. 2014)

(parallel citations omitted).

Appellant argues that Frederick was a "ward" of her family within the

meaning of the policy so as to provide for coverage. Appellant's Brief at 34.

Specifically, Appellant argues that Frederick was a ward because she and her

husband "were, at the least, [Frederick]'s quasi-guardians at the time of the

collision, providing him with clothing, shelter, money, food, and emotional

support." ***Id.*** Appellant relies heavily on this Court's decision in ***Donegal

Mutual Insurance Co. v. Raymond***, 899 A.2d 357 (Pa. Super. 2006), in

support of her argument.

In ***Raymond***, the plaintiff filed a declaratory judgment action seeking

insurance coverage for injuries sustained as a passenger in an automobile

accident, which occurred on September 28, 1998. ***Id.*** at 358. This Court

framed the issue as "whether [Raymond] was a 'ward' or 'foster child' such

- 7 -

that the injuries sustained … are the obligation of [the insurance company] to pay?" *Id.* This Court reviewed the terms of the subject policy, which contained, verbatim, the same definition of "family member" as is found in the policy subject to the instant appeal. *Id.* at 361.

In deciding whether Raymond was a "ward" within the meaning of the policy, this Court rejected the insurance company's argument that becoming a ward "require[s] formal action by a Court for legal recognition." *Id.* This Court looked to "the public policy of this Commonwealth" and noted that Raymond fit within the Motor Vehicle Financial Responsibility Law's (MVFRL) definition of an insured as he was "residing in the household of the named insured as a minor in the custody of the named insured when the accident occurred[.]" *Id.* at 364. This Court also looked to the circumstances surrounding Raymond's living situation with the insureds, the Decker family.

> Additionally, the record discloses that [Raymond] resided with and was cared for by the Deckers between August 28, 1997, and June 12, 1998, which latter date he returned to live with his biological parent. It was only when [Raymond] phoned the Deckers on September 28, 1998, and advised them of his [Mother being evicted from her home] that the former foster parents agreed to provide him with living arrangements. These amenities included sleeping accommodations, a place to keep all of [Raymond]'s clothes, and a family physician to attend to the medical needs of the child while under the Deckers' roof. Deposition of [Raymond], 3/11/02, at 10, 13. Furthermore, [Raymond] remained with the Deckers for almost ten (10) months after September 28, 1998, despite [Children and Youth Services of Lackawanna County's] knowledge of his whereabouts. To

interject into this family environment the lack of a parental consent agreement or a court order as the predicate to deny Appellee ward status on the day of accident is pure sophistry. *See* Deposition of Donald P. Nicastro, 11/11/02, at 22–23 ([Raymond]'s father signed a voluntary agreement on September 30, 1998, and the court issued an order on October 9, 1998, naming [Raymond] "a ward of the Deckers[.]").

*Id.* Based on the above, the *Raymond* Court concluded that Raymond was a ward of the Decker family.

Whether created by court order or not, [Raymond] was under the protection of the Deckers and had been for almost one year before the vehicular accident. All of the elements of a relationship of protector and ward were present except for a formal designation of the relationship from a court of competent jurisdiction or a parental execution of a consent agreement. Nonetheless, the relationship that existed was created by a history of the Deckers providing [Raymond] with care and protection, and his integration into the Deckers' family continued as of the date of the accident on September 28, 1998, and beyond until reunited with his natural mother on June 10, 1999.

*Id.* Therefore, this Court affirmed the judgment entered in favor of Raymond and against the insurance company. *Id.* at 365.

Turning to the case *sub judice*, we note, as the trial court did, that this case is strikingly similar to *Raymond*. Specifically, Appellant's complaint alleged as follows.

24. [Frederick], was adjudicated dependent and placed in the custody of Franklin County Children and Youth on October 30, 2003.

- 9 -

25. To date, [Frederick], had continuously lived with and been dependent upon foster parents, Betty L. Rourke and James C. Rourke since his placement with the Rourkes in October 2003.

26. During more than six years of dependency upon his foster parents, [Frederick] has maintained his own bedroom and kept his clothing and all other personal belongings at his foster parents' home.

27. The Rourkes have supported [Frederick], both financially and emotionally. They have provided all of his necessities and most importantly have loved and nurtured [Frederick] during the past six and a half years he has lived in their home.

28. Other than having a different last name, [Frederick] had been and continues to be treated in all respects as the Rourkes' natural child, and, for the past six and a half years, he has maintained a parent-son relationship with the Rourkes.

29. The Rourkes refer to [Frederick] as their son and he often calls them "mom and dad", [Frederick] calls his foster sisters "sis", and the Rourke's relatives treat [Frederick] the same as they treat the Rourke's [sic] biological children.

30. [Frederick]'s natural mother is deceased; [Frederick]'s natural father has minimal contact with his son. In fact, [Frederick]'s natural father has not called or visited his son since [Frederick] was released from the hospital following the collision.

31. After turning eighteen years of age on September 14, 2008, [Frederick], remained in the custody of the Franklin County Children and Youth and remained dependent upon the Rourkes, in order to complete secondary education.

…

43. Upon withdrawing from Allegheny College, [Frederick] did not seek full-time employment, but

remained financially dependant [sic] on the Rourke's [sic] while he pursued enrolling in Shippensburg University.

44. Upon being terminated from Franklin County's foster care program, [Frederick] continued to be the Rourke's [sic] *de facto* foster child or ward.

45. Despite no longer receiving a stipend from the County, the Rourkes continued to support [Frederick] by providing food and shelter, paying his bills, and continued to love and nurture him as though he was their biological son.

46. After [Frederick] was terminated from the foster care program, the Rourke's [sic] continued [to] act as [Frederick]'s *de facto* foster parents or guardians as they provided financial and emotional support to [Frederick] despite not being legally obligated to do so.

47. After [Frederick] was terminated from the foster care program, the Rourke's [sic] continued to look upon [Frederick] as their natural son and intended to help provide for his college education.

Appellant's Complaint, 8/27/10, at ¶¶ 24-31, 43-47.

Instantly, the trial court acknowledged that, as a factual matter, the facts pled by Appellant in her complaint were very similar to those of ***Raymond***. Trial Court Opinion, 3/21/12, at 7. Appellant's complaint alleged that Frederick lived with her family continuously since October 2003, had his own bedroom, and all of his personal possessions were in her home. Appellant's Complaint, 8/27/10, at ¶ 26. The complaint also alleged that Appellant and her husband have financially supported Frederick since then. *Id.* at ¶¶ 27, 43-47. Given our standard of review, accepting the allegations

of fact set forth in the complaint as true, we see no distinction between *Raymond* and the case *sub judice*. As in *Raymond*, the complaint adequately pled that Frederick was a *de facto* ward and this relationship "was created by a history of the [Rourkes] providing [Frederick] with care and protection, and his integration into the [Rourkes]' family[.]" *Raymond*, *supra*. Frederick benefited from a **former** adjudicated foster child relationship with the Rourkes but enjoyed a **current** ward status.

Despite this, Penn National argues, and the trial court concluded, that *Raymond* is distinguishable from the instant case as Frederick was not a minor at the time of the accident. Penn National's Brief at 9; Trial Court Opinion, 3/21/12, at 8. The complaint alleges that Frederick turned 18 years of age on September 14, 2008, his dependency was terminated on January 19, 2010, and the collision occurred on January 28, 2010. Appellant's Complaint, 8/27/10, at ¶¶ 6-7, 31, 38-39. Therefore, from September 14, 2008 until January 19, 2010, Frederick was still dependent and was **not** a minor. Penn National appears to acknowledge that Frederick would be eligible for coverage had his dependency not been terminated. *See* Penn National's Brief at 8 (stating, in relevant part, that Frederick was not a ward because "he was a competent, nineteen-year-old man who did not qualify as a foster child and indeed had already been formally adjudicated as no longer a 'dependent child[]'"). It therefore follows that Frederick's age does not factor into the calculus, as Frederick was covered

under the policy, at a minimum, as a ward of the Rourkes past his 18th birthday.

Moreover, we reject Penn National's assertion that a ward relationship cannot be established without a court order, as that argument was rejected by this Court in **Raymond**. **Raymond**, **supra** at 364. **Raymond** also stands in part for the proposition that the term "ward" in an insurance contract that contains no further definition is an ambiguous term, as it is susceptible to more than one definition.[3] **See id.** at 361-363; **St. John**, **supra**. Indeed, the trial court cited Black's Law Dictionary for the definition of "ward" as "a person **usu. a minor**, who is under a guardian's charge or protection." Black's Law Dictionary 1614 (8th ed. 2004) (emphasis added); Trial Court Opinion, 3/21/12, at 5.[4] As it is not specifically defined, there is

_____

[3] In its opinion in this case, the trial court acknowledged that the terms "foster child" and "ward" are susceptible to more than one dictionary definition. **See generally** Trial Court Opinion, 3/21/12, at 3-5.

[4] Curiously, Penn National, in its brief in support of its motion for judgment on the pleadings gives Wikipedia's definition as "someone placed under the protection of a legal guardian[.]" Penn National's Brief in Support of Motion for Judgment on the Pleadings, 9/19/11, at 8.

Wikipedia describes itself as "a multilingual, web-based, free-content encyclopedia project … [and] is written collaboratively by largely anonymous volunteers who write without pay. Anyone with Internet access can write and make changes to Wikipedia articles, except in limited cases where editing is restricted to prevent disruption or vandalism." Wikipedia, http://en.wikipedia.org/wiki/Wikipedia:About (last visited Feb. 12, 2015). We note that some federal courts have disapproved of citation to Wikipedia. **See generally United States v. Lawson**, 677 F.3d 629, 650 (4th Cir.
*(Footnote Continued Next Page)*

- 13 -

an ambiguity as to whether the term "ward" requires that the person be a minor. Even accepting the trial court's definition from Black's Law Dictionary, it only says that a ward is **usually** a minor. *See* Black's Law Dictionary 1614 (8th ed. 2004). Therefore, even the trial court's preferred definition does not foreclose the conclusion that a person may be a "ward" and **not** be a minor.

Here, the insurance policy included the term "ward" within the broader term "family member." We recognize that the term "ward" may carry with it potentially specialized legal meanings when defining legal duties among parties. ***See generally In re Guardianship of Zorek***, 475 A.2d 817, 818 (Pa. Super. 1984). However, these contexts, not being defined in the insurance policy, are not likely to be readily understood by the average insured, especially as the term is included expansively as part of the more familiar term "family member." Thus an insured, relying on a general understanding of the relational nature of a ward, may not be alerted of a need to take other legal action to extend coverage to a household member.

As noted above, our cases unequivocally state that "if an insurance policy contains an ambiguous term, the policy is to be construed in favor of

*(Footnote Continued)* ────────────

2012), *cert. denied sub nom.*, **Gilbert v. United States**, 133 S. Ct. 393 (2012); **Li v. Holder**, 400 F. App'x 854, 857-858 (5th Cir. 2010); **Basada v. Mukasey**, 540 F.3d 909, 910-911 (8th Cir. 2008). Although our Supreme Court has not commented on the subject, we generally look at arguments involving citations to Wikipedia with skepticism.

the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." **Pa. Nat'l Mut. Cas. Ins. Co.**, **supra**. Penn National, as the drafter of the policy, elected not to include a definition of "ward" in the policy. Nothing prevents Penn National or any insurer from drafting its policies and definitions more precisely or narrowly to avoid future litigation. However, it did not do so in this case. This Court must examine and construe the policy as it exists, not the way Penn National wishes it had drafted it with the benefit of hindsight. The law does not permit Penn National to give a definition in its policy and then *post hoc*, after a loss is reported, add an additional textual limitation onto the same term. Stated another way, Penn National cannot add an age restriction onto the term "ward" that is not contained within the policy at the time of its issuance. Based on these considerations, we hold that Appellant has sufficiently pled that Frederick was a ward of the Rourkes at the time of the loss, within the meaning of the policy.[5] Accordingly, we conclude that the trial court erred in granting judgment on the pleadings to Penn National based on its conclusion that Frederick was not a ward of the Rourkes.

---

[5] In light of our conclusion, we need not address Appellant's argument as to whether Frederick qualifies as a "foster child" within the meaning of the policy. **See Raymond**, **supra** at 365 n.6.

- 15 -

We next address Appellant's reasonable expectation of coverage issue, which was the subject of the trial court's May 21, 2014 order granting summary judgment in favor of Penn National. Appellant argues that the trial court erred when it granted summary judgment to Penn National on the claim that she had a reasonable expectation of coverage for Frederick under the subject policy. Appellant's Brief at 50. We begin by noting our well-settled standard of review.

> "[O]ur standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law[,] and our scope of review is plenary." **Petrina v. Allied Glove Corp.**, 46 A.3d 795, 797–798 (Pa. Super. 2012) (citations omitted). "We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." **Barnes v. Keller**, 62 A.3d 382, 385 (Pa. Super. 2012), *citing* **Erie Ins. Exch. v. Larrimore**, 987 A.2d 732, 736 (Pa. Super. 2009) (citation omitted). "Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered." **Id.** The rule governing summary judgment has been codified at Pennsylvania Rule of Civil Procedure 1035.2, which states as follows.
>
> **Rule 1035.2. Motion**
>
> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
>> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense

which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

"Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." ***Babb v. Ctr. Cmty. Hosp.,*** 47 A.3d 1214, 1223 (Pa. Super. 2012) (citations omitted), *appeal denied,* 65 A.3d 412 (Pa. 2013). Further, "failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." ***Id.***

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

***Id., citing Reeser v. NGK N. Am., Inc.,*** 14 A.3d 896, 898 (Pa. Super. 2011), *quoting **Jones v. Levin***, 940 A.2d 451, 452–454 (Pa. Super. 2007) (internal citations omitted).

***Cadena v. Latch***, 78 A.3d 636, 638-639 (Pa. Super. 2013).

This Court explained the reasonable expectation of coverage doctrine in the following terms.

> The reasonable expectation of the insured is the focal point of the insurance transaction involved here. ***Beckham v. Travelers Insurance Co.,*** 225 A.2d 532, 537 ([Pa.] 1967). Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect that they will receive something of comparable value in return for the premium paid …. Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent …. Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer. ***See, e.g., Rempel v. Nationwide Ins. Co.,*** 370 A.2d 366 ([Pa.] 1977).
>
> ***Tonkovic***[ ***v. State Farm Mut. Auto Ins. Co.***, 521 A.2d 920, 926 (Pa. 1987)].
>
> "Consumers … view an insurance agent … as one possessing expertise in a complicated subject." [***Id.*** at 368.] "It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself." ***Id.***[].

***Pressley v. Travelers Prop. Cas. Corp.***, 817 A.2d 1131, 1140-1141 (Pa. Super. 2003) (parallel citations and footnote omitted). Our Supreme Court

has also instructed that the reasonable expectations doctrine exists in part to protect non-commercial insureds from both deception and non-apparent terms. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 109 n.8 (Pa. 1999); *Tonkovic*, *supra* at 925-926; *see also Pressley*, *supra* at 1140 n.3.

In this case, Appellant argues that the totality of the circumstances surrounding the reporting of the loss shows that her expectation that Frederick would be covered as a "named insured" under the policy was reasonable. Appellant's Brief at 45. Specifically, Appellant avers that based on her "affirmative allegations, Lake's poor memory, and Strickler's own records, the only solid evidence suggests that the conversation occurred according to [Appellant]'s version of events." *Id.* at 49-50.

Lake testified at her deposition that she had no memory of any phone calls between her and Mr. Rourke. N.T., 4/25/13, at 22. Specifically, Lake had no recollection of what she would have discussed with either of the Rourkes regarding their policy. *Id.* at 23. Utilizing the notes in her file, Lake testified that a phone call between her and Mr. Rourke took place on February 3, 2010. *Id.* at 27. Lake noted that there was a policy change to add Frederick as a listed driver to a 2001 Ford Windstar, a vehicle on the Rourkes' policy, retroactive to January 28, 2010. *Id.* 28, 29. Lake testified this would have been at Mr. Rourke's request. *Id.* at 33. However, when asked "[i]f [the Rourkes] asked [her] if there's any way that [she knew] of

that [Frederick] could be covered for [a] crash from a week ago[,]" Lake answered "[n]o, and that's insurance fraud." *Id.* at 34. Lake explained that, according to the records in the file, Penn National retroactively added Frederick as a listed driver to one of the Rourkes' vehicles as of January 28, 2010. *Id.* at 36. However, Lake stressed being a listed driver on a covered vehicle is different than being a named insured on the policy. *Id.* Lake did not provide any explanation for why Penn National applied the change retroactively.

However, also contained within the record is the Rourkes' auto policy and a record of the premiums due before and after Frederick was added retroactive to January 28, 2010. It is clear that the Rourkes incurred additional premiums as a result of this change in the policy.[6] ***See generally*** Appellant's Response to Penn National's Motion for Summary Judgment, 2/20/13, Exhibit A, at 2, 4, 8, 10.[7] Yet, under Penn National's position, no benefit was derived by the Rourkes from the requested retroactive application of the change. Viewing the "dynamic" of the instant transaction, it is the retroactive application of the changes to the policy together with the admitted conversation between Mr. Rourke and Lake that creates a genuine

_____

[6] The additional premium of $497.00, when parsed out, reflect only benefits due an additional driver but that is only a factor to consider in evaluating the Rourkes reasonable expectations.

[7] We note the exhibit does not contain pagination. Therefore, we have assigned each page a corresponding number for ease of reference.

material question of fact as to the reasonable expectation of coverage the Rourkes may have had. *See Pressley*, *supra*.

As noted above, Lake testified that she could not recall the content of her conversation with Mr. Rourke. N.T., 4/25/13, at 22. Additionally, the parties agree that it was Frederick's loss that was the entire purpose of Mr. Rourke's conversation with Penn National. Finally, there is no explanation in the record for why any changes would be made retroactively if no benefit could be derived as a result. Accordingly, the representations made by Lake, the expectations held by the Rourkes, and the reasonableness of those expectations become an issue for the jury. *See Pressley*, *supra*; *Cadena*, *supra*. Therefore, under the unique circumstances of this case, we agree with Appellant that there is a genuine issue of material fact as to whether she reasonably believed that Frederick would be covered. This is for a jury to resolve as a matter of fact. *See Cadena*, *supra*.

Based on the foregoing, we conclude the trial court erred when it granted Penn National's motion for judgment on the pleadings, to the extent it held that Frederick was not a ward of the Rourkes. We further conclude that the trial court abused its discretion in granting Penn National's motion for summary judgment on Appellant's reasonable expectation of coverage issue. Accordingly, the trial court's March 21, 2012 and May 21, 2014 orders are reversed, and the case is remanded for further proceedings, consistent with this opinion.

Orders reversed. Case remanded. Jurisdiction relinquished.

Judge Stabile joins the opinion.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/28/2015